**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JAY HARRIS,
Plaintiff,

v.

STATE OF FLORIDA; SHAWN CRANE, in his official capacity as Chief Judge of the Sixth Judicial Circuit; BOB GUALTIERI, in his official capacity as Sheriff of Pinellas County; FLORIDA DEPARTMENT OF CORRECTIONS; and SARA B. MOLLO, in her official capacity as Public Defender for the Sixth Judicial Circuit,
Defendants, Jane Doe.

Case No. 8:26-CV-3349-MSS-SPF

**COMPLAINT FOR DISABILITY DISCRIMINATION RETALIATION AND INTERFERENCE UNDER THE ADA AND SECTION 504**

JURY TRIAL DEMANDED

## Introduction

1. Jay Harris is Deaf. His language is American Sign Language (ASL). When he goes to court, meets with his lawyer, is booked into jail, or reports to his probation officer, he can take part only if he has a qualified ASL interpreter he can see and understand.

2. For three years, the government offices in charge of those settings failed him, each in its own way:

(a) At the September 18, 2023 hearing that decided his interest in a property he bought at a foreclosure sale, the court's interpreter appeared on a video screen that kept freezing.

(b) On August 21, 2024, both interpreters assigned to his hearing left before it ended. No one replaced them.

(c) On November 16, 2024, with no qualified ASL interpreter provided, the judge asked his sister to interpret his first appearance. His sister is hard of hearing and could not understand the judge.

TPA 75178
$405.00

(d) On February 25, 2025, an assistant public defender wrote that an interpreter had been arranged for his plea meeting. No interpreter came.

(e) On December 4, 2025, the interpreter on the court's video screen said more than once that Mr. Harris's signing could not be understood, including his fingerspelling of the word "compel." The hearing went on.

(f) On January 9, 2026, after he reported a failing video interpreter at a probation meeting, his probation officers told him that if he kept raising it, he would be taken to jail.

(g) On October 26, 2026, the court canceled his November 2 hearing because "an interpreter is not available."

3. Each institutional defendant is a public entity, and the named officials are sued only in their official capacities as specified below. The entity responsible for each service must make its communications with Deaf people as effective as its communications with others. 28 C.F.R. § 35.160(a)(1). Mr. Harris identifies the requests, failures, and notice attributable to each defendant in the corresponding factual section.

4. Mr. Harris states claims because:

(a) he is a qualified individual with a disability under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act;

(b) each defendant denied him effective communication at the specific events listed below by date;

(c) officials with authority to correct the problem knew about it from his written requests, grievances and notices, and the failures continued; and

(d) he still has cases pending in the same courts, which use the same interpreter process that canceled his hearing on October 26, 2026.

5. This case is not about the outcome of any state case. Mr. Harris does not ask this Court to review, reverse or set aside any state-court judgment, order, plea, sentence or ruling. He does not ask the Court to rewrite statewide policy. He asks for damages for what happened to him and for an order limited to interpretation in his own pending cases.

6. The law on access to the courts is settled. Title II requires states to take reasonable steps to make their courts accessible to people with disabilities, and Congress validly applied that duty to the states. Tennessee v. Lane, 541 U.S. 509, 531-34 (2004).

**Jurisdiction and venue**

7. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343(a)(3)-(4). The claims arise under Title II of the ADA, 42 U.S.C. §§ 12131-12134; the ADA's anti-retaliation provision, 42 U.S.C. § 12203; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

8. The Court may grant declaratory relief under 28 U.S.C. §§ 2201-2202.

9. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) because the events described below took place in Pinellas County, Florida.

10. Congress expressly abrogated state sovereign immunity under the ADA, 42 U.S.C. § 12202. Tennessee v. Lane, 541 U.S. 509, 533–34 (2004), sustains that abrogation for the class of cases implicating the fundamental right of access to the courts. Other applications require the claim-by-claim analysis described in United States v. Georgia, 546 U.S. 151, 159 (2006), including actual constitutional violations and the validity of abrogation for the relevant class of conduct. For Section 504, a recipient state agency's acceptance of federal financial assistance supplies the waiver prescribed by 42 U.S.C. § 2000d-7.

11. Prospective relief against Chief Judge Crane is sought under Ex parte Young, 209 U.S. 123 (1908), for ongoing federal violations in the administration of communication access. The requested order concerns the accommodation process in Mr. Harris's pending proceedings and does not direct the outcome of any state-court dispute.

12. The Title II and Section 504 claims asserted here do not require Mr. Harris to complete the agencies' grievance procedures as a prerequisite to this civil action. Mr. Harris is not incarcerated when bringing this action and is no longer on probation. He asserts federal disability-access and retaliation claims, not a Florida tort claim.

13. Mr. Harris previously filed Harris v. Pinellas County, No. 8:24-cv-2459-TPB-TGW (M.D. Fla.), concerning some earlier events. On August 26, 2025, the court dismissed the second amended complaint without prejudice with leave to amend. Mr. Harris subsequently requested voluntary dismissal and reports that the action ended without prejudice on October 24, 2025. This complaint identifies that related action and includes later events.

**Parties**

14. Jay Harris lives in Palm Harbor, Pinellas County, Florida. He is Deaf. His deafness substantially limits the major life activity of hearing, so he has a disability under 42 U.S.C. § 12102(1)-(2) and is an individual with a disability under 29 U.S.C. § 705(20)(B). As a party to court cases, a detainee, a client of the Public Defender and a probationer, he met the eligibility requirements for each service described below, and he is a "qualified individual with a disability" under 42 U.S.C. § 12131(2).

15. The State of Florida is a public entity under 42 U.S.C. § 12131(1). Through the State Courts System and its Sixth Judicial Circuit, which covers Pinellas and Pasco Counties, the State runs the courts that hear Mr. Harris's cases. The Circuit's Court Administration,

including its ADA Coordinator and its court interpreter office, receives accommodation requests and schedules sign language interpreters. On information and belief, the State Courts System receives federal financial assistance, so its operations are a "program or activity" under 29 U.S.C. § 794(b)(1). Florida maintains a Federal Grants Trust Fund within the State Courts System under Fla. Stat. § 25.3842. The funding allegation concerns the recipient court system during the relevant periods, rather than federal assistance to unrelated state agencies.

16. Shawn Crane is the Chief Judge of the Sixth Judicial Circuit and is sued only in that official capacity. The chief judge of a circuit has administrative supervision over its courts and court administration, including interpreter services. Fla. R. Gen. Prac. & Jud. Admin. 2.215. Mr. Harris seeks only declaratory and prospective injunctive relief against Chief Judge Crane, limited to how interpreters are arranged in his pending cases. He seeks no damages from Chief Judge Crane and challenges no judicial ruling.

17. Bob Gualtieri is the Sheriff of Pinellas County and is sued only in that official capacity. The Sheriff operates the Pinellas County Jail, including booking, medical intake, and the telephones and other communication equipment available to detainees. The Sheriff's Office is a public entity under 42 U.S.C. § 12131(1). On information and belief, it receives federal financial assistance, including federal criminal-justice grants, so its operations are a "program or activity" under 29 U.S.C. § 794(b)(1). Public Pinellas County grant records identify recurring Edward Byrne Memorial Justice Assistance Grant allocations to the Sheriff's Office, including FY 2024 assistance. Mr. Harris seeks damages from the Sheriff in his official capacity, not from him personally.

18. The Florida Department of Corrections (FDC) is a state agency and a public entity under 42 U.S.C. § 12131(1). FDC supervised Mr. Harris's probation through its Tarpon Springs office. On information and belief, FDC receives federal financial assistance, so its operations, including probation supervision, are a "program or activity" under 29 U.S.C. § 794(b)(1). Florida maintains a Federal Grants Trust Fund within FDC under Fla. Stat. § 945.21503. Mr. Harris alleges receipt by the department during the relevant period and seeks discovery of the applicable award and acceptance records.

19. Sara B. Mollo is sued only in the official capacity of Public Defender for the Sixth Judicial Circuit, an office created by Article V, section 18 of the Florida Constitution. The Office of the Public Defender is a public entity under 42 U.S.C. § 12131(1)(B). It represented Mr. Harris in his criminal case, No. 24-06135-CF, through Assistant Public Defenders Steven Heusser and Nancy Williams, and it arranged interpreters for his meetings with them. On information and belief, the office received federal financial assistance during the relevant period, so its operations are a "program or activity" under 29 U.S.C. § 794(b)(1). If another person now holds the office, that person is substituted automatically. Fed. R. Civ. P. 25(d). The Section 504 funding allegation is specifically made on information and belief and is expected to receive further evidentiary support through the office's grant and acceptance records.

20. Each defendant is sued only for its own conduct. The facts for each defendant appear in a separate part below, and each count incorporates only the parts that apply to it.

21. The criminal proceedings, appointed-counsel consultations, detentions, and resulting probation supervision involved related stages of Mr. Harris's criminal-justice matters. The court-access incidents also concern his use of the same Circuit accommodation process in

civil and family proceedings. Each count nevertheless identifies the particular defendant and conduct on which liability rests.

## Facts

### A. Mr. Harris communicates in ASL, and the law requires communication that works for him

22. ASL is Mr. Harris's primary language. He cannot hear speech.

23. ASL is a complete language with its own vocabulary and grammar. It is not English signed word for word. ASL builds sentences from handshape, movement, placement in space and facial expression. Raised or lowered eyebrows, for example, mark a question.

24. Because ASL and English are separate languages, moving between them is interpretation, the same as moving between Spanish and English. An interpreter has to understand the meaning in one language and restate it in the other, in both directions.

25. Court hearings are among the hardest settings for this work. Several people speak quickly, sometimes at once. The words are technical: "intervene," "certificate of title," "motion to compel," "adjudication withheld." A missed word can change what a person agrees to.

26. ASL users spell out names and technical terms that have no common sign, letter by letter. This is called fingerspelling. An interpreter who cannot read Mr. Harris's fingerspelling cannot pass those words on to the court, and the court does not hear his side.

27. Lipreading is not a substitute for interpretation. Many English sounds are formed inside the mouth, and others look alike on the lips, such as "p," "b" and "m." A Deaf person watching lips has to guess at much of what is said, and the guessing gets harder on a video screen.

28. Written notes and speech-to-text did not provide effective communication for Mr. Harris in the complex or rapid exchanges described below. They did not convey the discussion to

him adequately in his primary language, ASL, or allow him to keep pace with questions and answers. He told FDC in writing on December 10, 2025 that speech-to-text had not worked for him.

29. A TTY is an older text telephone that sends typed messages over a phone line. Most Deaf ASL users today make calls by videophone, signing directly to the person they call or through a video relay interpreter. A TTY that does not work, or that a person cannot use, leaves that person with no telephone at all.

30. An interpreter in the same room can see Mr. Harris's signing, facial expressions and fingerspelling, and he can see the interpreter. In-person interpretation can facilitate requests for repetition, identify speakers, and support a private exchange with counsel when the setting and arrangements permit. Mr. Harris requested it because of the failures he experienced with the remote arrangements described below.

31. Video remote interpreting (VRI) puts the interpreter on a screen from another place. It works only when the video is smooth and clear. When the picture freezes, blurs or lags, part of each sign is lost, and a sign with a missing part can mean something else. Mr. Harris cannot ask a frozen screen to repeat itself.

32. For that reason, the Department of Justice requires every public entity that uses VRI to provide:

"(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

(2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;

(3) A clear, audible transmission of voices; and

(4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI."

28 C.F.R. § 35.160(d).

33. Interpreting sustained, complex legal exchanges can cause fatigue that affects accuracy. Team interpretation can permit alternating interpreters, continuity, and assistance with missed information. Mr. Harris requested two interpreters for proceedings whose length or complexity required that coverage, including the specific settings described below.

34. The law defines a "qualified interpreter" by what the interpreter can do, not by a certificate. A qualified interpreter is one who, in person or by VRI, "is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 35.104. "Receptively" means the interpreter must understand Mr. Harris's signing, not only sign to him. An interpreter who cannot understand him is not qualified for him, whatever the interpreter's credentials.

35. A public entity must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

36. The right aid depends on "the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). A public entity "shall give primary consideration to the requests of individuals with disabilities." Id. And aids "must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." Id.

37. A public entity may not require a Deaf person to bring someone to interpret. 28 C.F.R. § 35.160(c)(1). It also "shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication," with two exceptions: an emergency involving an imminent threat to safety when no interpreter is available, or a case where the Deaf person specifically asks for that adult, the adult agrees, and relying on the adult is appropriate. 28 C.F.R. § 35.160(c)(2).

38. A Deaf person meeting with a lawyer, or speaking with a lawyer during a hearing, needs confidential communication with counsel. At the April 28, 2025 hearing described below, the available remote interpreter connection was shared with the courtroom and provided Mr. Harris no private interpreted channel when he needed to consult his lawyer.

39. A public entity may not retaliate against a person for opposing disability discrimination, and may not "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of" rights protected by the ADA. 28 C.F.R. § 35.134(a)-(b); 42 U.S.C. § 12203(a)-(b).

40. For Mr. Harris, the nature, length, complexity and circumstances of the exchanges described below required the following accommodations where necessary for effective communication:

(a) a qualified ASL interpreter, arranged in time;

(b) in-person interpretation when necessary for effective communication, with primary consideration given to his request;

(c) team interpretation when the length, complexity or other circumstances made a team necessary for effective communication;

(d) an interpreter present for the whole proceeding;

(e) VRI only when it met the standards in paragraph 32 and worked in fact; and

(f) a private way to communicate with his lawyer.

41. Each event below is measured against one question: could Mr. Harris understand, and be understood, as well as a hearing person in his place?

**B. The State's courts failed again and again to give Mr. Harris interpretation he could understand, after written notice**

**Mr. Harris has asked the court in writing for ASL interpreters since 2022**

42. In January 2022, Mr. Harris was the successful third-party bidder at a foreclosure sale in Ridgemoor Master Association, Inc. v. Mauro, No. 19-000813-CO, in the County Court for Pinellas County. Hearings followed on his interest in the property.

43. On February 28, 2022, Mr. Harris submitted the court's online ADA accommodation form asking for an ASL interpreter at a March 14, 2022 hearing (reference number 23445055). On March 3, 2022, he emailed the same request to the court's interpreter office. No qualified interpreter appeared on March 14.

44. No interpreter appeared at the next hearing, on May 17, 2022. That morning Mr. Harris wrote the judicial assistant that "there was no sign language interpreter" and "It was not accessible for me as a disabled person." The next day he wrote the Circuit's ADA Coordinator, Joe McKeever.

45. On June 8, 2023, court staff acknowledged ASL accommodation request No. 27841946 for a June 15, 2023 hearing in the same case. On June 15, the interpreter office wrote that it had not secured an interpreter.

46. The events in paragraphs 42-45 are pleaded to show that the court knew, from 2022 on, that Mr. Harris needs ASL interpreters. They are not separate claims for damages.

**September 18, 2023: the interpreter's video kept freezing during the hearing that decided his interest in the property**

47. On September 18, 2023, Judge Susan P. Bedinghaus held a one-hour Zoom hearing in No. 19-000813-CO on a motion to intervene and a joint motion to set aside the foreclosure sale and vacate the certificates of sale and title. The hearing decided Mr. Harris's interest in the property.

48. The court's interpreter, Rosalind Gillis, appeared by video. The video froze again and again. The lighting was poor and the image lacked contrast, so Mr. Harris could not read the signs clearly. The interpretation could not keep up with the pace of the hearing.

49. Mr. Harris asked for repetitions. The court did not pause long enough for the interpretation to catch up. He missed legal information and instructions, and he could not fully present his position.

50. After the hearing, the court entered rulings adverse to the interest Mr. Harris asserted in the property and later denied a refund request. His claim here concerns the opportunity to understand, communicate, and participate during the hearing. He does not ask this Court to reverse the state rulings. Any claimed economic loss must be his own loss and must have resulted from the access violation independently of a request to overturn those rulings.

51. The certificate of sale identifies a $30,100 successful bid. Mr. Harris also reports auction-related expenses and approximately $5,000 in related legal charges. Some payment records identify TRUE-BIZ ASL LLC. He seeks recovery of his own net economic loss, after any refunds and credits, to the extent caused by the denial of effective communication and legally recoverable. The amount and ownership of each claimed loss will be established through the sale, payment, refund, and legal-fee records.

**August 21, 2024: both interpreters left before the hearing ended, and no one replaced them**

52. On August 21, 2024, at 9:00 a.m., Mr. Harris appeared for a hearing in No. 24-005531-FD at the Pinellas County Justice Center. Two ASL interpreters were present at the start. Both left before the hearing ended, saying they had other appointments.

53. The judge tried to find replacement interpreters and could not. The hearing stopped and was rescheduled. Mr. Harris sat in open court unable to follow his own case.

54. He submitted a written grievance on August 22, 2024. Court staff acknowledged it that day and again by letter on August 26.

**August 28, 2024: the interpreter could not keep up with his signing or the legal terms**

55. On August 28, 2024, in the same case, the assigned interpreter, identified to him as Jessica, could not keep up with Mr. Harris's signing and repeatedly interrupted the hearing to ask for clarification. The interpretation did not convey the legal terms in a way he could follow. Mr. Harris did not see the interpreter take an oath. His concern was the resulting inability to understand and be understood, including the legal terminology; asking for clarification by itself is not the alleged failure.

56. On September 10, 2024, Mr. Harris submitted two written grievances, one about August 28 and one about earlier court and jail failures. Court staff formally acknowledged them on September 17.

**September 2024: interpreters were in short supply, and video interpretation failed**

57. On September 20, 2024, Mr. Harris's assistant public defender, Steven Heusser, wrote him that his court time had been moved "due to the lack of Court certified sign language interpreters."

58. On September 23, 2024, at a pretrial hearing in his criminal case, No. 24-06135-CF, technical failures in the video interpretation kept Mr. Harris from understanding and taking part. The hearing had to be rescheduled.

59. By letter dated October 24, 2024, court personnel answered his August grievances. They denied any ADA violation, described limits on interpreter scheduling, and offered to reassign interpreters.

60. On October 25, 2024, Mr. Harris submitted a grievance about September 23. The court's November 25 response acknowledged the unresolved technical problems and the rescheduling, and again denied a violation.

**November 16, 2024: with no qualified ASL interpreter provided, the judge asked his sister, who is hard of hearing, to interpret**

61. On November 16, 2024, Mr. Harris appeared for an advisory hearing in No. 24-05896-OC-MM. No qualified interpreter was present.

62. The judge asked Mr. Harris's sister, Elaine Gale, to interpret. Mr. Harris's account is that he did not request her as the interpreter and that no emergency required reliance on her. His sister is hard of hearing and could not understand what the judge said.

63. Mr. Harris could not understand the hearing or take part in it.

64. He submitted a grievance dated December 6, 2024. In a letter dated January 15, 2025, Court Counsel confirmed that a family member had interpreted at the hearing, which lasted about five minutes.

65. Court Counsel's January 15, 2025 response described weekend advisory interpreter arrangements as ordinarily initiated by jail personnel. Mr. Harris attributes the conduct of

the hearing to the court and the jail's own responsibility for arranging effective communication to the Sheriff; he does not treat the two entities as interchangeable.

**January 6, 2025: one interpreter came and the hearing was continued**

66. On January 6, 2025, in No. 23-008209-SC, one interpreter appeared for a proceeding that Mr. Harris understood required a team. The hearing was continued. This incident supports his account of inadequate coverage and resulting delay; the necessary coverage must be assessed in light of the proceeding's actual communication demands.

**April 28, 2025: the video froze, and he had no private way to talk to his lawyer**

67. On April 28, 2025, at a hearing in No. 24-06135-CF, the interpreter appeared by Zoom. The video froze. Mr. Harris had trouble following the hearing and could not consult privately with his lawyer, because the only interpreter was on a screen shared with everyone in the courtroom.

**May 2025: court officials acknowledged his grievance in writing**

68. On May 8, 2025, Mr. Harris submitted a written ADA and Section 504 grievance about his court hearings. Court staff acknowledged it on May 9. On May 13, Court Counsel Lyndsey E. Siara acknowledged it in writing, with copies to ADA Coordinator Jesus Gonzalez and Director Inass Riyad.

69. The court's June 5, 2025 response disputed parts of his account and treated his meetings with his public defender as outside the court's responsibility.

**July 2025: the video failed again, and the next hearing was canceled**

70. On July 21, 2025, at a telephone and video hearing on motions in No. 24-06135-CF, the interpretation repeatedly froze and blurred, and Mr. Harris could not tell who was speaking. He could not follow or answer the discussion. He reported the failure that day.

71. On July 25, 2025, court staff offered Zoom interpretation for a July 28 hearing. Because of the July 21 failure, Mr. Harris asked for an interpreter in person. Staff cited short notice, and the July 28 hearing was canceled.

**September 8, 2025: no interpreter was present when his case was called**

72. On September 8, 2025, at a pretrial hearing in No. 24-06135-CF, no interpreter was present when his case was called. Mr. Harris told staff he could not understand or take part.

**October 14, 2025: the interpreter office turned down his request, and the hearing was reset**

73. On October 13, 2025, the interpreter office wrote that request No. 31971775 for an October 14 hearing omitted the hearing's duration and had been submitted without sufficient notice. No ASL interpreter was available for the October 14 setting, and it was reset to November 18, 2025. The alleged event is the failed setting and resulting delay.

**December 4, 2025: the interpreter on the screen could not understand him, and the hearing went on**

74. On December 4, 2025, Mr. Harris attended a case-management hearing in Harris v. Lowe's Home Centers, LLC, No. 23-008658-CI. He had asked for an interpreter in person.

75. The court used an interpreter on video instead, identified to him as Sue Ann. The video froze repeatedly. The interpreter said more than once that Mr. Harris's signing and fingerspelling could not be understood, including his fingerspelling of the word "compel."

76. Mr. Harris told the court, out loud and in writing, that he could not understand, and he asked for an interpreter in person. The hearing went on. He could not follow or answer the discussion of discovery, motions, deadlines and scheduling. He asked that this interpreter not be assigned to him again.

**January 29, 2026: one interpreter came late, the other joined from a car, and the hearing was rescheduled**

77. On January 21, 2026, Mr. Harris asked for ASL interpretation at a January 29, 2026 hearing in his family case, No. 52-2022-DR-008903. The court's confirmation listed Brooke Jensen in person and Sue Ann Pope by Zoom.

78. At the 3:00 p.m. hearing, Brooke Jensen arrived late. Sue Ann Pope joined by video from a vehicle, and the video kept freezing. Brooke Jensen told the court that interpreting the proceeding alone was not comfortable. Effective communication was never established, and the hearing was rescheduled.

**June 2026: hearing canceled because no interpreter was available**

79. On June 15, 2026, Judicial Assistant Lidia Torres told Mr. Harris that his June 17 hearing in No. 23-008658-CI had to be canceled and reset because an ASL interpreter was unavailable.

**August 21 2026 family evidentiary hearing**

80. On August 21, 2026, Mr. Harris attended an evidentiary hearing in his family case, No. 52-2022-DR-008903, concerning the mother’s amended counter-motion for enforcement and contempt. The interpretation did not enable him adequately to understand the proceeding and communicate his position.

81. Mr. Harris did not observe the interpreters take an oath. At the end of the hearing he was not permitted to finish his statement, and the matter was continued for further hearing. His federal access claim concerns ineffective communication and its effect on his participation. The oath issue is additional context to be evaluated against the recording and applicable state requirements.

**October 2026 hearing arrangements**

82. In October 2026, the court proposed new hearing dates in the same case. Mr. Harris asked for a hearing in person with an ASL interpreter. On October 19, 2026, court staff confirmed an in-person hearing for November 2, 2026, from 1:30 to 2:00 p.m., and wrote that it would be reset if no interpreter was available.

83. On October 26, 2026, Judicial Assistant Torres wrote: "We have been advised that an interpreter is not available on 11/2/26. The next availability when an interpreter is available is on 11/18/26 @3:30pm-4pm." The email added: "Our office is working diligently to make sure interpreter is present in person."

84. On October 28, 2026, Mr. Harris told Judicial Assistant Torres that he was unavailable November 18 and requested alternative dates. On October 29, Torres proposed December 3, 2026, from 3:30 to 4:00 p.m., in person, as a date compatible with the court calendar and ASL interpreter availability. She requested the parties' confirmation. That proposal is not itself a final hearing notice.

85. The repeated cancellations and continuances delayed Mr. Harris's opportunity to present and resolve pending matters. His claim rests on the particular accommodation requests, advance notice, communication failures, and responses described above. The October 28–

29 correspondence also identifies his own scheduling unavailability, which is distinct from interpreter unavailability.

**Court officials with authority to fix the problem knew about it and did not fix it**

86. The Circuit's interpreter office schedules interpreters. Its ADA Coordinator and Court Administration, under the Chief Judge's administrative supervision, receive accommodation requests and grievances. On information and belief, the administrators responsible for those functions can implement corrective interpreter arrangements, including in-person assignments, sufficient team coverage, and responses to failed VRI. Their role in addressing Mr. Harris's requests is reflected in the written acknowledgments and substantive responses described below.

87. Those officials knew of the failures above. They received Mr. Harris's grievances of August 22, September 10 and October 25, 2024, his December 2024 grievance, and his May 8, 2025 grievance. Court Counsel answered them in writing. ADA Coordinator Gonzalez received the May 2025 grievance and Mr. Harris's written notices of December 16, 2025 and February 10, 2026, and acknowledged the February notice on February 11, 2026.

88. After these notices, similar problems recurred: frozen video, interpreters who left or did not appear, interpretation that did not convey Mr. Harris's signing, and hearings canceled for lack of an interpreter. Officials offered reassignment and rescheduling, but those measures did not adequately address the recurring barriers identified in his later requests and grievances. He alleges knowing failure to provide an adequate corrective response, not merely the existence of a scheduling error.

89. At the hearings where substantive discussion continued without effective interpretation, Mr. Harris could not meaningfully understand or answer what was said about the matters before the court. Those facts implicate his due-process right to a meaningful opportunity to be heard and the court-access principles recognized in Lane. His statutory claims also encompass the distinct failures described above; the constitutional analysis depends on the circumstances of each event.

**C. The Public Defender's office arranged interpreters for his meetings, and the interpreters did not come**

90. The Office of the Public Defender represented Mr. Harris in No. 24-06135-CF. The office arranged the interpreters for his meetings with his assistant public defenders.

91. The office knew interpreters were hard to get. On September 20, 2024, Assistant Public Defender Heusser wrote Mr. Harris that his court time had been moved "due to the lack of Court certified sign language interpreters."

92. On February 25, 2025, Assistant Public Defender Nancy Williams wrote Mr. Harris that Williams would attend his Friday office appointment and had arranged for a sign language interpreter.

93. On Friday, February 28, 2025, Mr. Harris met with Assistant Public Defender Heusser to discuss the State's plea offer. No interpreter came. Mr. Harris could not fully understand the plea discussion or take part in planning his defense.

94. On June 18, 2025, Mr. Harris emailed Heusser to confirm a June 30 trial-preparation meeting at 2:30 p.m. and asked for confirmation of the ASL interpreter. Heusser replied that a legal assistant in the office handled the interpreter request and that the concern would be passed on.

95. Before the meeting, Mr. Harris sent a written outline of what he needed to discuss. The interpreter canceled at 1:41 p.m., 49 minutes before the meeting. No one arranged a replacement. No one told Mr. Harris until about 3:00 p.m., after the meeting time had passed. He could not prepare for trial with his lawyer.

96. On July 1, 2025, Mr. Harris emailed Heusser and Williams to document the failed meeting and its effect on his defense.

97. In August 2025, after the failed consultations, Mr. Harris hired private criminal-defense counsel because he could not adequately prepare through meetings he could not understand. He reports paying Joffe Law, P.A. $20,700, consisting of the $20,000 fee and $700 in processing charges. He seeks defense expenses to the extent proven to have resulted from the denial of effective communication. The agreement, invoices, payment records, and work performed will establish the recoverable amount.

98. The office's emails show that the assistant public defenders knew Mr. Harris needed an interpreter and undertook to arrange one. The February 28 failure and the renewed June request gave notice of the risk of another inaccessible consultation. The June interpreter canceled at 1:41 p.m.; no replacement was supplied and notice reached Mr. Harris only after the appointment time. He alleges that the officials responsible for correcting communication access failed adequately to respond to that known risk. Their authority to obtain replacement or additional consultation is material to this claim.

99. The February and June consultations concerned a plea offer and trial preparation in a pending criminal prosecution. Their failure prevented meaningful consultation with appointed counsel at those times and implicates the Sixth and Fourteenth Amendments in

the claim-specific immunity analysis. Mr. Harris challenges the administration of communication access, not counsel's professional judgment about defense strategy.

**D. The Sheriff's jail booked and held him without an interpreter or a working phone**

100. On June 30, 2024, Mr. Harris was arrested and taken to the Pinellas County Jail. He was booked and went through medical intake without an ASL interpreter. He could not fully understand the questions he was asked or answer them accurately.

101. During that detention he asked for a videophone or another way to reach his family and his lawyer. Jail staff responsible for detainee communication sent him to a TTY that did not work or that he could not use. No working alternative was provided. Hearing detainees could make phone calls. Mr. Harris could not.

102. On November 15 and 16, 2024, Mr. Harris was again held at the Pinellas County Jail. Again he had no effective interpretation and no working way to make calls.

103. Jail staff responsible for communication services received Mr. Harris's requests directly. The TTY did not provide an effective means for him to complete the needed calls, and he received no working alternative. On information and belief, the officials responsible for detainee communication could obtain assistance or authorize another effective method. Their identities, responsibilities, and any supervisory involvement are expected to be reflected in jail records. By the November detention, the jail had already held him once and recorded that he was a Deaf ASL user. He again requested assistance and experienced the same access failures.

104. The June and November requests described above concern notice during the detentions. The later November 10, 2025 notice to counsel is separate evidence of subsequent notice and does not by itself establish what a jail official knew in 2024. Mr. Harris seeks damages

for the jail's own denials of intake and telephone access and its own role in arranging advisory-hearing interpretation.

**E. FDC supervised his probation without interpreters he could use, then warned him that complaining could send him to jail**

105. FDC supervised Mr. Harris's probation through its Tarpon Springs office from November 2025 until the court terminated probation on May 22, 2026. Correctional Probation Senior Officer Haley Faul supervised him. Correctional Probation Supervisor Jeff Deremer and Correctional Probation Senior Supervisor Leonor Vona reviewed his complaints. These officers arranged interpreters, answered his complaints, and had authority to change how interpreters were provided. The correspondence described below shows Deremer personally answering access complaints and directing the office's response, and Faul communicating interpreter arrangements and probation requirements. Vona received the identified escalations.

106. Probation meetings set what a probationer must do to stay out of jail: reporting, travel, payments, drug testing and special conditions. A probationer who misunderstands a condition can be violated for breaking it.

107. On November 18, 2025, Mr. Harris attended a probation appointment with Officer Faul. He had asked for an interpreter. None was provided. The methods used instead did not let him fully understand his probation conditions, his reporting and travel requirements, or how to make payments.

108. On December 5, 2025, the same thing happened. He had asked for an interpreter, none was provided, and he again could not fully understand the requirements discussed.

109. On December 8, 2025, Officer Faul directed Mr. Harris to report at 2:00 p.m. to discuss a travel permit. He wrote that he was running late and asked to move to 3:00 p.m. That day he also disputed Faul's statement that he had declined an interpreter. He explained that he had requested one and had not understood the rules, special conditions and payment requirements tied to travel permission. His request was denied after he had prepaid travel. Any claimed loss is the net unreimbursed amount attributable to the alleged communication failure.

110. On December 9, 2025, Supervisor Deremer disputed his account but wrote that interpreters would be arranged for future office appointments. On December 10, Mr. Harris replied that speech-to-text had not worked for him and identified November 18, December 5 and December 8 as contacts at which no interpreter was provided.

111. On December 18, 2025, Officer Faul confirmed an interpreter for a January 9, 2026 appointment at 1:00 p.m.

112. At the January 9 appointment, the interpreter appeared by video on a laptop. The video froze and disconnected again and again. Mr. Harris had great difficulty understanding the interpretation or making himself understood about his probation obligations. Officer Faul later identified the interpreter for that period as Laura Miller. His January 9 email also described repeated fingerspelling requests and interpretation that did not accurately convey his statements. Faul's January 23 response identified Laura Miller when addressing the prior appointment and the next assignment.

113. When Mr. Harris raised the video failures and asked about the interpreter's qualifications, Officer Faul and Supervisor Deremer told him that if he kept asking questions or raising

access concerns, he would be taken to jail. Because of that warning, he stopped asking for clarification while the communication problem was still unresolved.

114. At approximately 3:01 p.m. on January 9, Mr. Harris emailed Officer Faul, copying Supervisor Deremer, to document the failed VRI, difficulty understanding ASL, and the alleged warning of jail. He wrote that he had immediately complied, remained silent, and stopped pursuing the issue during the meeting. This contemporaneous account identifies both the protected access inquiry and the resulting interference with his effort to obtain clarification.

115. On January 14, 2026, Supervisor Deremer replied, copying Supervisor Vona and Officer Faul. He denied that communication had failed, asserted that Mr. Harris had confirmed understanding, characterized his conduct as disruptive, and stated that good-faith accessibility inquiries alone would not lead to jail. He also stated that disruption or noncompliance could result in revocation and incarceration. Mr. Harris disputes that his good-faith access questions were misconduct and relies on his January 9 account.

116. On January 23, 2026, Mr. Harris again reported trouble understanding the interpretation at his last appointment and asked who the next interpreter would be. Officer Faul answered that Laura Miller would interpret again, stated that the interpreter was qualified, and described his complaints after appointments as a pattern meant to get the outcome he wanted, which would not be tolerated.

117. On April 13, 2026, Mr. Harris wrote Officer Faul that the interpretation at his three most recent appointments had not worked, including during a discussion of drug testing and of whether international travel required a court motion. He asked for the interpreter's name and qualifications. Officer Faul forwarded the complaint to Supervisors Vona and

Deremer, and that internal chain identified the interpreter as Skye Miller. On April 21, Supervisor Deremer answered that three certified interpreters had been used. Mr. Harris's complaint was that he could not understand the interpretation, not that the interpreters lacked certificates.

118. On May 22, 2026, the court terminated Mr. Harris's probation. He seeks no injunction against FDC.

119. Probation conditions carry potential consequences for conditional liberty. Mr. Harris alleges that inaccessible explanations prevented him from understanding requirements he was expected to obey, and that the January 9 warning deterred him from seeking clarification while communication was still failing. These circumstances support his claim-specific constitutional and statutory arguments. He does not seek reversal of the plea or sentence, which he reports ended through early termination of probation.

120. The January 9 warning, as Mr. Harris experienced and promptly reported it, expressly linked possible jail to continued questions about interpretation and accessibility. The same supervisor later rejected his account and continued the challenged communication approach. Mr. Harris alleges that the warning was given because he sought effective access and caused him to stop seeking clarification during the meeting; his later written complaints do not erase that immediate effect.

121. FDC's receipt of federal assistance is separately relevant to its Section 504 liability. Its sovereign-immunity defense to the ADA retaliation and interference counts requires analysis of those claims in the Title II public-services setting; receipt of funding is not pleaded as an automatic waiver for every ADA claim.

**F. Mr. Harris gave written notice before filing this case**

122. On November 10, 2025, Mr. Harris emailed written notice of these failures to counsel for the Sheriff and counsel for the State, among others. Counsel for the Sheriff acknowledged receipt the same day.

123. On December 16, 2025 and February 10, 2026, he emailed supplemental notices about the December 4, 2025 and January 29, 2026 hearings to the same counsel, to ADA Coordinator Gonzalez, and to the Circuit's ADA email address. Coordinator Gonzalez acknowledged the February notice on February 11, 2026.

124. On August 25, 2026, Mr. Harris arranged certified mailing of written notices to the Florida Department of Financial Services, Division of Risk Management, and to identified defense counsel. He retains mailing and tracking information. Any allegation of actual receipt depends on the corresponding delivery or acknowledgment record.

**G. Mr. Harris still has cases in the same courts, and the failures are continuing**

125. Mr. Harris has cases pending in the Sixth Judicial Circuit: No. 23-008658-CI, where an attorney's charging-lien dispute remains open, and his family case, No. 52-2022-DR-008903, which has pending motions and a case-management conference still to be scheduled. He also has a pending appeal from No. 23-008658-CI in Florida's Second District Court of Appeal, No. 2D2026-2696.

126. The court proposed November 18, 2026 after reporting no interpreter for November 2. Mr. Harris was unavailable November 18, and the October 29 correspondence proposed December 3, 2026, from 3:30 to 4:00 p.m., subject to confirmation. He continues to need interpretation for the pending charging-lien proceedings.

127. On October 27, 2026, Mr. Harris requested a thirty-minute case-management conference in his pending family case and included an ASL interpreter request. The judicial assistant directed the parties to coordinate a date and make the appropriate interpreter request. The continued family evidentiary matter and pending motions will require further participation through the Circuit's accommodation process.

128. To take part in those hearings, Mr. Harris must use the same interpreter office and accommodation process that failed him on December 4, 2025, January 29, 2026, June 17, 2026 and November 2, 2026.

129. Mr. Harris's pending matters require further hearings. The recurring failures after identified notices, his continuing requests, and the same administrative process create a substantial risk of further ineffective communication or access-related delay. He seeks a prospective remedy tailored to his own proceedings. Money damages after the fact cannot restore his ability to understand and participate while a hearing occurs.

**H Injury and monetary relief**

130. Mr. Harris seeks compensatory damages for the loss and injury caused by each defendant's own proven violation, including recoverable out-of-pocket expenses and additional legal expenses caused by inaccessible proceedings or consultations. The property-related bid, expenses, and fees are subject to the ownership, refund, and independent-causation issues described above. His private-defense expenditures are subject to proof connecting the work and cost to the failed consultations.

131. For probation, he seeks any net, nonrefunded travel expenditures proven to have resulted from FDC's failure to communicate applicable requirements effectively, as well as other legally compensable injury established by the evidence. He seeks nominal damages where

available if an actionable violation is established without a proven compensatory amount. The amount of monetary recovery is to be determined at trial, without duplicate recovery for the same injury.

## Claims for relief

### Count I: Title II of the ADA, 42 U.S.C. § 12132, against the State of Florida (court proceedings)

132. Mr. Harris incorporates paragraphs 14, 15, 20-89 and 122-129. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count.

133. Mr. Harris is a qualified individual with a disability. As a party to court cases, he was entitled to take part in the State's court proceedings.

134. At the proceedings identified in the court-access section, the State's accommodation arrangements failed to provide effective communication in the circumstances alleged. The failures included repeatedly frozen video, interpretation that did not convey his signing or material legal information, insufficient coverage, and reliance on a family member who could not adequately understand the judge. The repeated scheduling failures also delayed access despite the identified requests and notices. Those acts and omissions denied Mr. Harris an equal opportunity to understand and participate by reason of his deafness, in violation of 42 U.S.C. § 12132 and 28 C.F.R. §§ 35.130 and 35.160.

135. The officials administering interpreter services received the identified accommodation requests, grievances, and supplemental notices. On information and belief, the officials responsible for resolving those requests had authority to institute corrective measures. The repeated notices identified the substantial likelihood of ineffective communication. Mr.

Harris alleges deliberate indifference in their failure adequately to respond to those known barriers, notwithstanding the reassignment and rescheduling efforts described above. Liese v. Indian River County Hospital District, 701 F.3d 334, 344–50 (11th Cir. 2012); Silberman v. Miami Dade Transit, 927 F.3d 1123, 1134–35 (11th Cir. 2019).

136. The court-access allegations fall within Lane's class of cases implicating access to judicial proceedings. Where substantive proceedings continued without effective communication, Mr. Harris alleges denial of a meaningful opportunity to be heard concerning the interests before the court. Any further immunity analysis is governed by Georgia on a claim-by-claim basis.

137. Mr. Harris seeks compensatory damages in an amount determined at trial, including his own recoverable economic losses caused by the September 18, 2023 access failure and other identified court-access violations; nominal damages where legally available; and the declaratory and injunctive relief requested below.

**Count II: Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the State of Florida (court proceedings)**

138. Mr. Harris incorporates paragraphs 14, 15, 20-89 and 122-129. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count.

139. The State Courts System is a program or activity receiving federal financial assistance. 29 U.S.C. § 794(b)(1).

140. Mr. Harris was otherwise qualified to take part in the State's court proceedings. Solely by reason of his disability, he was excluded from participation in, denied the benefits of, and

subjected to discrimination in those proceedings through the failures described in paragraphs 47-83, in violation of 29 U.S.C. § 794(a).

141. The officials described in paragraph 135 acted with deliberate indifference.

142. Mr. Harris seeks compensatory damages in an amount to be determined at trial, nominal damages, and the declaratory and injunctive relief requested below. 29 U.S.C. § 794a(a)(2).

**Count III: Title II of the ADA, 42 U.S.C. § 12132, against the Sheriff in the official capacity (jail)**

143. Mr. Harris incorporates paragraphs 14, 17, 20-41, 100-103 and 122. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count. He additionally incorporates paragraphs 61–64 and paragraphs 65 and 104, limited to the Sheriff's own accommodation responsibilities.

144. As a detainee, Mr. Harris was qualified to receive the jail's booking, medical intake and communication services.

145. During his June 30, 2024 and November 15-16, 2024 detentions, the Sheriff failed to provide an interpreter for booking and medical intake and failed to provide a working means of making calls. Those failures denied him the benefits of the jail's services by reason of his disability, in violation of 42 U.S.C. § 12132 and 28 C.F.R. §§ 35.152 and 35.160.

146. During the detentions, the responsible staff received Mr. Harris's requests and knew that the provided method did not permit him to complete the needed communications. He alleges that responsible officials with authority to correct the denial failed adequately to respond. The direct requests, repeated denials, and corrective responsibilities described in the jail section support his deliberate-indifference theory; the officials' identities and

precise authority are material facts to be established through the jail's records and other evidence.

147. Mr. Harris seeks compensatory damages in an amount to be determined at trial and nominal damages. He does not seek an injunction against the Sheriff.

**Count IV: Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the Sheriff in the official capacity (jail)**

148. Mr. Harris incorporates paragraphs 14, 17, 20-41, 100-103 and 122. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count. He additionally incorporates paragraphs 61–64 and paragraphs 65 and 104, limited to the Sheriff's own accommodation responsibilities.

149. The Sheriff's Office is a program or activity receiving federal financial assistance. 29 U.S.C. § 794(b)(1).

150. Mr. Harris was otherwise qualified for the jail's services. Solely by reason of his disability, he was denied the benefits of those services through the failures described in paragraphs 100-103, in violation of 29 U.S.C. § 794(a).

151. The jail staff described in paragraph 146 acted with deliberate indifference.

152. Mr. Harris seeks compensatory damages in an amount to be determined at trial and nominal damages. 29 U.S.C. § 794a(a)(2).

**Count V: Title II of the ADA, 42 U.S.C. § 12132, against FDC (probation)**

153. Mr. Harris incorporates paragraphs 14, 18, 20-41 and 105-119. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count. He additionally incorporates paragraphs 120–121.

154. As a probationer, Mr. Harris was qualified to take part in FDC's probation supervision.

155. FDC failed to give him effective communication at his November 18, December 5 and December 8, 2025 contacts and his January 9, 2026 appointment. The lack of requested interpreters, the use of speech-to-text that did not work for him, and video interpretation that froze and disconnected denied him the benefits of probation supervision by reason of his disability, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.160.

156. Officer Faul and Supervisors Deremer and Vona had the roles described in the probation section. Faul and Deremer received the identified requests and complaints, and Deremer personally directed the response. They knew the access problems Mr. Harris reported and had authority to address interpreter arrangements. He alleges deliberate indifference in their inadequate response to those known problems, including the January 9 warning that deterred further clarification. Vona's responsibility is based on her supervisory role and receipt of the identified escalations, rather than an assumption that she attended the January meeting.

157. The identified failures concerned probation conditions that Mr. Harris had to understand to protect his conditional liberty. He alleges deprivation of meaningful notice and communication about those obligations in the circumstances described, to be evaluated under Georgia's claim-specific analysis.

158. Mr. Harris seeks compensatory damages in an amount determined at trial, including net travel costs proven lost because FDC failed to communicate applicable requirements effectively, and nominal damages where available. He seeks no prospective injunction against FDC because probation has ended.

**Count VI: Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against FDC (probation)**

159. Mr. Harris incorporates paragraphs 14, 18, 20-41 and 105-119. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count. He additionally incorporates paragraphs 120–121.

160. FDC is a program or activity receiving federal financial assistance. 29 U.S.C. § 794(b)(1).

161. Mr. Harris was otherwise qualified for probation supervision. Solely by reason of his disability, he was denied the benefits of that supervision through the failures described in paragraphs 107-117, in violation of 29 U.S.C. § 794(a).

162. The officers described in paragraph 156 acted with deliberate indifference.

163. Mr. Harris seeks compensatory damages in an amount to be determined at trial and nominal damages. 29 U.S.C. § 794a(a)(2).

**Count VII: Retaliation under the ADA, 42 U.S.C. § 12203(a), against FDC**

164. Mr. Harris incorporates paragraphs 14, 18, 20-41 and 105-119. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count. He additionally incorporates paragraphs 120–121.

165. Mr. Harris engaged in protected activity. He asked for effective ASL interpretation and opposed probation contacts he reasonably and in good faith believed violated his rights under Title II.

166. On January 9, 2026, Officer Faul and Supervisor Deremer told Mr. Harris that continued questions or complaints about interpreter effectiveness and accessibility could result in jail. He reported the warning that afternoon. On January 23, Faul characterized his recurring access complaints as a pattern intended to obtain his preferred outcome and said it would not be tolerated. A warning of incarceration from the officers supervising his probation

would deter a reasonable person from raising access concerns. Mr. Harris in fact stopped seeking clarification during the January 9 meeting.

167. The alleged January 9 warning expressly connected the threatened consequence to continued access questions. Mr. Harris alleges that his protected activity was a but-for cause of that warning. His requests sought reliable interpretation and understanding of his obligations, and he disputes defendants' characterization of those requests as misconduct. This conduct violated 42 U.S.C. § 12203(a) and 28 C.F.R. § 35.134(a).

168. Mr. Harris seeks damages and other relief available under 42 U.S.C. § 12203(c) and the public-services remedies incorporated through 42 U.S.C. § 12133, including compensatory and nominal damages to the extent legally recoverable. The claim concerns retaliation for exercising Title II rights in probation services and requires a claim-specific determination of immunity and available remedies.

**Count VIII: Interference and intimidation under the ADA, 42 U.S.C. § 12203(b), against FDC**

169. Mr. Harris incorporates paragraphs 14, 18, 20-41 and 105-119. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count. He additionally incorporates paragraphs 120–121.

170. At the January 9, 2026 appointment, Mr. Harris was exercising his right to effective communication in FDC's probation services.

171. By threatening incarceration in response to continued efforts to obtain effective interpretation, Faul and Deremer intimidated Mr. Harris and interfered with his exercise of the right to accessible probation services. He immediately stopped seeking clarification while the communication difficulty remained unresolved. He alleges this interference

independently of whether the same conduct also satisfies the retaliation elements. 42 U.S.C. § 12203(b); 28 C.F.R. § 35.134(b).

172. Mr. Harris seeks damages and other relief available under 42 U.S.C. § 12203(c) and the public-services remedies incorporated through 42 U.S.C. § 12133, including compensatory and nominal damages to the extent legally recoverable. The claim concerns interference with the exercise of Title II rights in probation services and requires a claim-specific determination of immunity and available remedies.

**Count IX: Title II of the ADA, 42 U.S.C. § 12132, against the Public Defender in the official capacity (attorney meetings)**

173. Mr. Harris incorporates paragraphs 14, 19, 20-41 and 90-99. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count.

174. As a client of the Public Defender, Mr. Harris was qualified to receive the office's legal representation services, including meetings with his assistant public defenders.

175. The office arranged interpreters for his February 28 and June 30, 2025 meetings. No interpreter came to either meeting, and no replacement was provided. Those failures denied him the benefits of the office's services by reason of his disability, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.160.

176. The attorneys responsible for the meetings knew Mr. Harris needed interpretation, undertook the arrangements, and received notice of the failed consultations. After the February failure and the renewed June request, the office did not provide a replacement interpreter or timely notice of the June cancellation. Mr. Harris alleges deliberate

indifference by officials responsible for correcting communication access through their failure adequately to respond to the known risk of another failed consultation.

177. The inaccessible consultations concerned a plea offer and preparation for trial in a state criminal prosecution. They prevented meaningful consultation at those times and implicate the Sixth and Fourteenth Amendments in the claim-specific immunity analysis.

178. Mr. Harris seeks compensatory damages in an amount determined at trial, including private-defense expenses proven to have resulted from the denial of effective communication, and nominal damages where legally available. He seeks no injunction against the Public Defender.

**Count X: Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the Public Defender in the official capacity (attorney meetings)**

179. Mr. Harris incorporates paragraphs 14, 19, 20-41 and 90-99. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count.

180. On information and belief, the Office of the Public Defender was a recipient program or activity under 29 U.S.C. § 794(b)(1) during the relevant period, as alleged in the parties section. Mr. Harris specifically identifies this funding allegation as requiring further evidentiary support from award and acceptance records.

181. Mr. Harris was otherwise qualified for the office's services. Solely by reason of his disability, he was denied the benefits of those services through the failures described in paragraphs 92-96, in violation of 29 U.S.C. § 794(a).

182. The assistant public defenders described in paragraph 176 acted with deliberate indifference.

183. Mr. Harris seeks compensatory damages in an amount to be determined at trial and nominal damages. 29 U.S.C. § 794a(a)(2).

**Count XI: Title II of the ADA, 42 U.S.C. § 12132, against Chief Judge Crane in the official capacity (prospective relief only)**

184. Mr. Harris incorporates paragraphs 14, 16, 20-89 and 122-129. He also incorporates paragraphs 130–131, limited to the injury and relief attributable to this count. He does not incorporate any preceding count.

185. Mr. Harris must continue using the Circuit's interpreter process for his pending civil and family matters. The failures after notice include the December 4, 2025 and January 29, 2026 hearings, the August 21, 2026 evidentiary proceeding, and interpreter-related cancellations and continuing requests through October 2026. The pending matters and current scheduling requests establish his ongoing need for an effective accommodation process.

186. On information and belief, Chief Judge Crane's administrative supervision under Florida Rule of General Practice and Judicial Administration 2.215 includes the Circuit accommodation process operated through Court Administration and its interpreter office. The requested remedy concerns that administrative connection and the provision of effective communication in Mr. Harris's pending proceedings.

187. Mr. Harris seeks a declaration of his right to effective communication in his pending cases and an injunction limited to how interpreters are arranged for him, as described below. He seeks no damages from Chief Judge Crane and no direction on how any judge rules in his cases. 42 U.S.C. § 12133; 28 U.S.C. §§ 2201-2202.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Harris requests judgment granting the following relief:

A. A declaration resolving the ongoing controversy concerning effective communication in Mr. Harris's pending Sixth Judicial Circuit cases, and such other declaratory relief as is legally available for the violations established under the counts above.

B. An injunction against Chief Judge Crane in his official administrative capacity, and against the State to the extent legally permissible, limited to Mr. Harris's pending Sixth Judicial Circuit cases, requiring responsible administrative personnel to:

(1) arrange qualified ASL interpretation in time for each proceeding, based on its nature, length, complexity and setting and giving primary consideration to Mr. Harris's request;

(2) evaluate anticipated proceedings exceeding one hour or involving witness testimony for team coverage, and assign a team of two interpreters whenever necessary to maintain effective communication;

(3) provide in-person interpretation when necessary for effective communication, taking account of the documented failures of remote arrangements;

(4) use VRI only when it meets 28 C.F.R. § 35.160(d) and provides effective communication in the actual setting;

(5) arrange uninterrupted interpreter coverage for the entire proceeding, including necessary relief or replacement interpreters;

(6) implement a prompt response when interpretation or equipment fails, including notifying the presiding judicial officer, seeking a pause or reset when necessary to restore access, arranging an effective replacement, and communicating any changed setting to Mr. Harris: and

(7) provide a confidential means of interpreted communication with counsel when consultation is part of the proceeding.

C. Compensatory damages against the State, Sheriff, FDC and Public Defender, each for injury caused by that defendant's actionable conduct and to the extent authorized by the applicable statute. The requested monetary relief includes legally recoverable economic losses, additional legal expenses and net travel losses described above, in amounts to be determined by the jury at trial.

D. Nominal damages where legally available for established violations for which compensatory loss is not proven, without duplicate recovery for the same injury.

E. Taxable costs and, if represented by counsel, reasonable attorneys' fees and litigation expenses authorized by 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b).

F. Prejudgment and postjudgment interest to the extent permitted by law.

G. Any other appropriate relief consistent with the pleaded federal claims and proven facts.

**JURY DEMAND**

Mr. Harris demands trial by jury on all issues so triable.

Dated: November 4th, 2026

Respectfully submitted,

Jay Harris, Plaintiff, pro se
4825 Hummingbird Trl..
Palm Harbor, 34683
Email: jayharris.asl@gmail.com
Videophone: 727-228-1330